UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ROSCHELLE MCNEIL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:10 CV 2305 DDN |
| | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Roschelle McNeil for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. 401, et seq., and supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 8.) For the reasons set forth below, the ALJ's decision is remanded for reconsideration and further proceedings consistent with this opinion.

**I. BACKGROUND**

On May 13, 2008, plaintiff filed applications for DIB and SSI, alleging a disability onset date of January 1, 2007. (Tr. 51.) Plaintiff alleged disability caused by narcolepsy, cataplexy, and depression. (Id.) On July 17, 2008, her application was denied. (Tr. 60.) On August 13, 2008, plaintiff filed a written request for hearing by an ALJ.[1] On September 23, 2009, a hearing was held before an ALJ, with plaintiff and a vocational expert giving testimony. (Tr. 21-46.) On

---

[1] Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 4040.966, 416.1406, 416.1466 (2010). These modifications include, among other things, the elimination of the reconsideration step. See id.

January 22, 2010, the ALJ issued an unfavorable decision. (Tr. 9-16.) On January 22, 2010, plaintiff filed a request for review. (Tr. 1-4.) On November 2, 2010, her request was denied by the Appeals Council. (Id.) Thus, the decision of the ALJ stands as the final decision of the Commissioner of Social Security.

## II. MEDICAL HISTORY

Plaintiff reports that she had a history of narcolepsy for at least the past 12 years. (Tr. 29, 238) She began treatment at the Clayton Sleep Institute under the care of Dr. Korgi V. Hegde, M.D., on January 15, 2007. (Tr. 226-27.) A polysomnography conducted at the Clayton Sleep Institute on January 27, 2007 showed that although plaintiff had only a very short sleep latency and sleep onset REM during the night, her daytime sleepiness was in the pathologic range. (Tr. 226-27.) She reported symptoms consistent with hypnagogic hallucinations,[2] and was diagnosed with narcolepsy[3] and cataplexy.[4] (Tr. 226, 261.) She was treated with Provigil,[5] at an initial dosage of 200 mg per day. (Tr. 78.)

On March 21, 2007, plaintiff reported that the medication was not controlling her daytime somnolence. (Tr. 258-59.) Her dosage of Provigil was subsequently increased to two doses of 200 mg per day as of April 17, 2007. (Tr. 259-60) After she reported that she was still falling asleep uncontrollably during the day, her dosage was increased again to three doses of 200 mg per day on May 8, 2008. (Tr. 260.) Dr.

---

[2] Hypnagogic hallucinations are hallucinations experienced when the mind is coming out of a state of sleep. Stedman's Medical Dictionary, 930 (28th ed. 2006).

[3] Narcolepsy is a sleep disorder consisting of recurring episodes of sleep during the day and often disrupted nocturnal sleep. Stedman's Medical Dictionary, 1281 (28th ed. 2006).

[4] Cataplexy is a transient attack of extreme generalized muscular weakness, often precipitated by an emotional response, such as surprise, fear or anger. Stedman's Medical Dictionary, 324 (28th ed. 2006).

[5] Provigil is used to decrease extreme sleepiness due to narcolepsy and other sleep disorders. WebMD, http://www.webmd.com/drugs (last visited June 23, 2011).

Hegde's treatment notes also indicate that he considered adding the medication Xyrem[6] at that time, but did not prescribe it. (Id.)

On October 22, 2009, Dr. Hegde wrote a narrative report in which he stated that plaintiff's narcolepsy had not been brought under control by the prescribed medication. (Tr. 266.) He further reported that her cataplexy episodes were worsening and he had recently prescribed Zoloft[7] in an effort to control it. (Id.) Dr. Hegde also indicated that plaintiff had reported the recent development of sleep paralysis in addition to the hypnagogic hallucinations. (Id.) He concluded that plaintiff's ability to function effectively in a work setting were compromised by her narcolepsy, and that she could not drive or operate hazardous machinery, which made her unable to sustain competitive employment. (Id.)

On June 30, 2008, plaintiff was seen by Amy Marty, Ph.D., for a consultative psychological evaluation. (Tr. 237-41.) She drove herself to this appointment. (Tr. 237.) Plaintiff reported experiencing significant symptoms of depression most of the day, every day of the week, and expressed feelings of embarrassment and shame in connection with her condition. (Tr. 237-38.) She also reported taking psychotropic medication as prescribed by her primary care physician from May of 2008. (Tr. 238.) Dr. Marty analyzed plaintiff's current level of daily functioning in four categories. Concerning activities of daily living, Dr. Marty believed that plaintiff generally relied on her husband and older daughter to complete the majority of household chores. (Tr. 240.) Concerning social functioning, Dr. Marty described plaintiff as appearing socially isolated because of her narcolepsy. (Id.) Concerning her appearance and ability to care for personal needs, Dr. Marty found that plaintiff was able to care for her own needs. (Id.) Concerning concentration, persistence, and pace, Dr. Marty found that plaintiff evidenced ability to maintain adequate attention and concentration with

---

[6] Xyrem is used to decrease daytime sleepiness, unwanted daytime naps, and nighttime awakening in patients with narcolepsy. WebMD, http://www.webmd.com/drugs (last visited June 23, 2011).

[7] Zoloft is used to help restore a patient's mood, sleep, appetite, and energy. WebMD, http://www.webmd.com/drugs (last visited June 23, 2011).

appropriate persistence and pace throughout the evaluation. (Id.) Dr. Marty diagnosed plaintiff as having major depressive disorder, mild, single episode. (Tr. 240.) Dr. Marty also diagnosed plaintiff with occupational problems and social isolation, and assigned an Axis V GAF score of 70.[8] (Id.) Dr. Marty's prognosis was "Guarded, fair with appropriate mental health treatment." (Tr. 241.)

On July 17, 2008, Kyle Devore, Ph.D., completed a Psychiatric Review Technique Form. (Tr. 247-57.) Dr. Devore concluded that overall, plaintiff's functional limitations were not severe. (Tr. 257.)

On June 10, 2008, plaintiff completed a Missouri Supplemental Questionnaire about her alleged disability. (Tr. 139-46.) She indicated that when she tried to fight off her sleepiness, her hallucinations became worse. (Tr. 139.) Plaintiff reported that she was able to pay bills, do laundry, dishes, make the bed, iron, vacuum, take out the trash, rake leaves, garden, do banking, go to the post office, and go grocery shopping for 30 minutes at a time. (Tr. 141-42) She also reported that she had to stop cooking, and her husband and daughter prepared meals. (Tr. 142.) Plaintiff reported that she napped every two to three hours, and did household cleaning between her naps. (Tr. 143.) She reported that she fell asleep while reading, and could not watch a TV program lasting longer than 30 minutes. (Tr. 143.) She reported that she was able to drive in a limited capacity within a ten-mile radius, and drove her children to and from school. (Tr. 144.) She reported that she left the house a few times a week because of her children, but otherwise would not leave the house. (Id.)

On June 15, 2008, plaintiff's mother, Gwendolyn Mundy, completed a Functional Report Adult – Third Party. (Tr. 147-155.) Ms. Mundy

---

[8] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
  On the GAF scale, a score from 61 to 70 represents mild symptoms (such as depressed mood or mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy, or theft within the household), but the individual generally functions pretty well and has some meaningful interpersonal relationships. Diagnostic and Statical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

reported that she visited with plaintiff at plaintiff's house a few days per week. (Tr. 147.) She reported that plaintiff often did not get dressed for the day. (Tr. 148.) She also reported that plaintiff did not cook, because of the danger of falling asleep while cooking, but did light cleaning and laundry. (Tr. 149.) Ms. Mundy reported that plaintiff needed encouragement to get out of a depressed mood. (Tr. 149.) She reported that plaintiff left the house to visit her parents and occasionally attend church, but otherwise rarely leaves the home. (Tr. 151-52.) She also indicated that plaintiff often fell asleep without warning in the middle of conversations, and suffered cataplexic episodes upon laughing. (Tr. 152.)

On June 6, 2009, plaintiff completed a Pain Questionnaire. (Tr. 186-188.) She did not indicate any symptoms of pain. (Id.)

Also on June 6, 2009, plaintiff completed an additional Function Report. (Tr. 189-196.) She described her daily activities as consisting of preparing her child for school and taking her to the bus stop, dressing for the day, attempting to do school work on the computer but typically falling asleep, and setting several alarms in an effort to be awake when her child returns from school on the school bus. (Tr. 189.) She also reported that she sometimes fell asleep in the bathtub. (Tr. 190.) She reported doing household chores such as dish washing, vacuuming, and laundry in intervals of up to 15 minutes at a time. (Tr. 191.) Plaintiff reported that she is able to drive short distances, and would drive to the grocery store, post office, and school. (Tr. 192.) She reported falling asleep in the middle of paying bills. (Tr. 193.) She reported spending time with family and friends approximately twice per week, but that her visitors knew that she would likely fall asleep during their visits. (Id.) She reported that she did not go to public events or places because of her uncontrollable sleep habits. (Tr. 194.) She also reported that her cataplexy affected her during periods of extreme emotional states, causing her to collapse and have jaw tremors. (Tr. 196.)

On June 12, 2009, plaintiff's mother, Gwendolyn Mundy, completed an additional Functional Report – Adult – Third Party. (Tr. 197-204.) She reported that plaintiff was no longer able to work, cook, drive, shop,

or converse without falling asleep. (Tr. 198.) She also indicated that plaintiff did not regularly get dressed. (Id.) She reported that plaintiff was still able to do light cleaning and laundry. (Tr. 199.) Ms. Mundy reported that plaintiff usually needs to be driven, rather than driving on her own. (Tr. 200.) She also indicated that plaintiff visited with other a couple of times per month and attended church, but that she would have liked plaintiff to get out more, because she rarely left the home. (Tr. 201-02.) She also indicated that plaintiff would collapse from a cataplexic episode if she laughed hard. (Tr. 202.)

**Testimony at the Hearing**

Plaintiff appeared and testified at the hearing held on September 23, 2009. (Tr. 22-40.) She testified that she was 40 years old at the time of the hearing, and holds an Associate's degree with additional training in cosmetology and real estate. (Tr. 25.) She has previously worked as a substitute teacher and as a cosmetologist at a hair salon she previously owned with her husband. (Tr. 26.) She has not worked since January 2008. (Tr. 28.) Plaintiff testified that she was prevented from working by excessive daytime sleepiness, narcolepsy, cataplexy, and hallucinations. (Tr. 28, 35.) She testified that she was first diagnosed in January 2007, but had a twelve year history of narcoleptic symptoms that had gradually become more severe. (Tr. 29.) Plaintiff confirmed that she worked for a significant part of that twelve-year period with narcoleptic symptoms. (Id.)

Plaintiff testified that Provigil helps her with the deepness of her sleep, sleep paralysis, and hallucinations, but does not help her stay awake. (Tr. 29.) She is unable to stay awake during the day and is unable to sleep at night. (Tr. 32, 39) She testified that she has a followup medical appointment at the Clayton Sleep Institute scheduled for October 5, 2009 to adjust her Provigil dosage and consider prescribing additional medications. (Tr. 31.)

Plaintiff testified that she spends the majority of her day sleeping. (Tr. 32.) She described suffering from constant fatigue and an average of seven to eight episodes of uncontrollable sleep per day, with hallucinations typically once per day. (Tr. 36.) She can do

laundry, vacuum, dust, care for her young daughter, and clean her home in between her episodes, but cannot cook because she might fall asleep. (Tr. 33,40.) She takes online courses from a home computer, with a disability access report from the school that allows her unlimited time to complete the assignments. (Tr. 33.)

Vocational Expert (VE) Jeffrey Magrowski, Ph.D., also testified at the hearing. (Tr. 40-46.) He classified plaintiff's past work experience as light, skilled labor. (Tr. 41.) The first hypothetical posed by the ALJ assumes an individual of plaintiff's same age, educational level, and past work experience has no exertional limitations, but can never climb ropes, ladders, and scaffolds, and should avoid all exposure to unprotected heights and hazardous machinery. (Tr. 41.) The VE testified that the individual would be able to perform plaintiff's past work of substitute teaching. (Id.)

A second hypothetical posed by the ALJ includes the same limitations as the first, but also limits the individual to unskilled work only, which requires no more than occasional contact with the general public. (Id.) The VE testified that the individual would not be able to perform any of plaintiff's past work. (Id.) However, the individual would be able to perform other jobs available in the national and regional economies, such as office helper, garment bagger, and folder of clothes or laundry. (Tr. 42.)

A third hypothetical posed by the ALJ adds the additional limitations that any job must allow for occasional, unscheduled disruptions of both the workday and workweek due to the necessity of having to lie down and sleep for extended periods of time during the workday. (Tr. 42.) The VE testified that he did not know of any jobs in the economy that an individual with such limitations could perform. (Id.)

Plaintiff's attorney then asked the VE whether, if all of plaintiff's testimony regarding her symptoms and limitations were to be taken as true, she would be capable of sustaining competitive employment. (Tr. 43.) The VE testified that he was not aware of any work she would be capable of sustaining with such restrictions. (Id.)

### III. DECISION OF THE ALJ

The ALJ's found that plaintiff had not been disabled under the Social Security Act (SSA) from the alleged onset date of January 1, 2007 through the date of the decision. (Tr. 9.)

The ALJ determined that plaintiff met the insured status requirements of SSA through December 31, 2010. (Tr. 11.) The ALJ then followed a five-step sequential evaluation process for determining whether plaintiff was disabled. At Step One, he determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 1, 2007. (Id.)

At Step Two, the ALJ determined that plaintiff had the severe impairments of narcolepsy and cataplexy. (Tr. 11.) He determined that plaintiff's depression was not severe. (Id.) In making this finding regarding plaintiff's mental status, he considered the four broad functional areas set out in the disability regulations for evaluating mental disorders, known as the "paragraph B" criteria: activities of daily living, social functioning, concentration, and episodes of decompensation. (Tr. 11-12.) He found that plaintiff's medically determinable mental impairment caused no more than mild impairment in the first three functional areas, and no indication of any impairment in the fourth functional area. (Tr. 12.)

At Step Three, the ALJ determined that plaintiff did not have any of the impairments or combination of impairments that meet or medically equal one of the impairments described in the Listing of Impairments, 20 CFR § 404, Subpart P, Appendix 1. (Tr. 12.)

The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climbing ropes, ladders and scaffolds; avoiding all exposure to unprotected heights and industrial hazards; and performing only unskilled work that requires no more than occasional contact with the general public and coworkers. (Tr. 12.)

In making this finding, the ALJ followed a two-step process. (Tr. 12.) First, he determined that plaintiff had an underlying medically determinable impairment that could reasonably be expected to cause some

of her alleged symptoms. (Tr. 12,14.) Second, the ALJ evaluated the intensity, persistence, and limiting effects of plaintiff's symptoms for determining the extent to which they limit her ability to perform basic work activities. (Tr. 13.) The ALJ found that the evidence contained in the record failed to support plaintiff's testimony of suffering from a severe and debilitating impairment or combination of impairments. (Tr. 14.) He based his conclusion on the fact that (1) plaintiff had continued to work with narcolepsy for the majority of the previous twelve years;(2) none of her treating physicians had ever recommended that she not seek employment until after her disability claim had been denied; (3) she was able to take computer classes; (4) she drove herself to her evaluation with Dr. Marty; and (4) she had not had any treatment from September of 2008 through July of 2009. (Tr. 14.) The ALJ also found that the medical record contained no evidence of significant medical worsening of plaintiff's condition. (Id.)

The ALJ afforded little weight to the medical opinions contained Dr. Hegde's October 22, 2009 correspondence regarding plaintiff's impairments. (Tr. 14.) The ALJ stated that he discounted this report from the treating physician because (1) Dr. Hegde's statement that plaintiff definitely could not drive was contradicted by plaintiff's own behavior; (2) the doctor's own treatment notes showed no prior opinion that plaintiff could not or should not work, and instead noted several times that she was working as a cosmetologist; (3) there was no evidence that over the course of treatment plaintiff had experienced any significant worsening; (4) the correspondence was drafted at the request of plaintiff's attorney in anticipation of litigation rather than in the normal course of treatment; and (5) the doctor's opinions were conclusory and only spoke to issues that are reserved for the Commissioner. (Id.)

At Step Four, the ALJ found that plaintiff was unable to perform any past relevant work. (Tr. 14.) The ALJ did not provide further explanation of this finding. (Id.)

At Step Five, the ALJ found that considering plaintiff's age, education, work experience, and RFC, she was capable of performing other jobs that existed in significant numbers in the national economy. (Tr. 15.) He determined that plaintiff's ability to work at all exertional

levels had been compromised by nonexertional limitations, and found the resultant work opportunities to be consistent with the second hypothetical posed to the VE. (Tr. 15.) He found plaintiff to be capable of working as an office helper, bagger, and laundry folder. (Id.) He further found that these jobs existed in significant numbers in the national economy. (Id.) As a result, he found that plaintiff was not disabled under the Act. (Tr. 16.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her disability meets or equals a listed

impairment.  <u>Pate-Fires</u>, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  <u>Id.</u>  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  <u>Id.</u>  The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work.  <u>Id.</u>  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  <u>Id.</u>

In this case, the ALJ determined that plaintiff could not perform her past work, but retained the RFC to perform other jobs that existed in significant numbers in the national economy.

## V. DISCUSSION

Plaintiff argues that the ALJ's decision is not supported by substantial evidence.  Specifically, she contends that (a) the ALJ failed to consider the opinion of the treating physician, Dr. Hegde properly; (b) the ALJ failed to ensure that the record was fully and fairly developed by re-contacting Dr. Hegde; (c) the ALJ failed to rely on at least "some medical evidence" to support his determination of her RFC; (d) the ALJ's conclusion that the medical record shows "no worsening" in her condition is contradicted by the record; and (e) that the hypothetical questions posed to the VE did not capture the concrete consequences of her impairments and therefore do not constitute substantial evidence.

### A. Opinion of Dr. Hegde

Plaintiff argues that the ALJ improperly weighed the opinion of the treating physician, Dr. Hegde.

A treating physician's opinion is entitled to controlling weight, if it is appropriately supported and not inconsistent with other substantial evidence.  20 C.F.R. § 404.1527(d)(2); <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-13 (8th Cir. 2000); <u>Brace v. Astrue</u>, 578 F.3d 882, 885 (8th Cir. 2009).  However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole."

Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir.2005) (citations omitted); accord Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009). "When an ALJ discounts a treating physician's opinion, he should give 'good reasons' for doing so." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (upholding an ALJ's discounting of a treating physician's opinion because it was not supported by the doctor's prior treatment notes and undermined by plaintiff's testimony about her activities).

In this case, the ALJ gave several reasons for assigning Dr. Hegde's October 22, 2009 opinion little weight. (Tr. 14.) First, the ALJ observed that the opinions expressed by Dr. Hegde were inconsistent with his own prior treatment notes. (Id.) The record reflects that Dr. Hegde had never advised plaintiff not to seek work, and instead noted that she was working as a cosmetologist. (Tr. 258.) "Physician opinions that are internally inconsistent are entitled to less deference than they would receive in the absence of inconsistencies." Wagner v. Astrue, 499 F.3d 842, 850 (8th Cir. 2007) ("We conclude . . . that the ALJ was entitled to discount Dr. Tjossem's November 5, 2004 opinion because it was inconsistent with his October 8, 2003 opinion and February 5, 2005 opinion.").

Furthermore, even though Dr. Hegde's correspondence states that "[d]efinitely, [plaintiff] cannot drive" (Tr. 266), the written record indicates that she does in fact drive in a limited capacity, including to the grocery store, her parents' house, and taking her children to school. (Tr. 144, 192.) "An appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion [of the treating physician]." Goff, 421 F.3d at 789-90.

Additionally, the ALJ found the opinion to be conclusory in nature. (Tr. 14.) A conclusory opinion "contains few explanations and is composed almost entirely of conclusions." Thomas v. Sullivan, 928 F.2d 255 (8th Cir. 1991). "A treating physician's opinion does not deserve

controlling weight when it is nothing more than a conclusory statement." Hamilton v. Astrue, 518 F.3d 607 (8th Cir. 2008).

In this case, the portion of Dr. Hegde's opinion stating that plaintiff "cannot sustain competitive employment" (Tr. 266) is a conclusory statement regarding plaintiff's ability to work. "A medical source opinion that an applicant is 'disabled' or 'unable to work' involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Brown v. Astrue, 611 F.3d 941, 952 (citations omitted); accord Vossen v. Astrue, 612 F.3d 1011, 1015; S.S.R. 96-5p (July 2, 1996) (giving such opinions controlling weight would "in effect, confer upon the treating source the authority to make" disability determinations).

Therefore, the ALJ acted within his purview in affording little weight to Dr. Hegde's October 22, 2009 opinion.

**B.  Duty to Re-Contact Dr. Hegde**

Plaintiff argues that the ALJ failed to ensure that the record was fully and fairly developed, in that the ALJ had an obligation to re-contact Dr. Hegde for clarification and additional information.

A social security hearing is a non-adversarial proceeding, and thus an ALJ has a duty to develop the record fully, including seeking clarification from treating physicians if a crucial issue is underdeveloped or undeveloped. See Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006); Garza v. Barnhart, 397 F.3d 1087, 1089–90 (8th Cir. 2005) (per curiam) (ALJ's duty to develop record fully and fairly exists even when claimant is represented by counsel).

That said, "the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010) (citations omitted); accord Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

Here, as in Goff, the ALJ "did not find the doctors' records inadequate, unclear, or incomplete, nor did [he] find the doctor[] used unacceptable clinical and laboratory techniques. Instead, the ALJ discounted the opinion[] because [it was] inconsistent with other

- 13 -

substantive evidence.  In such cases, an ALJ may discount an opinion without seeking clarification." Goff, 421 F.3d at 791.  The ALJ had a clear understanding of Dr. Hegde's opinion as expressed in his October 22, 2009 correspondence, and decided to give the opinion little weight in light of its contents and other facts in the record.  Thus, the ALJ had no obligation to re-contact Dr. Hegde before giving "little weight" to his opinion.

**C. "Some medical evidence" in support of the RFC**

The ALJ's duty to develop the record fully and fairly also requires that the ALJ identify "some medical evidence that supports the ALJ's residual functional capacity finding." Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000).  "If there is no such evidence, the ALJ's decision cannot be said to be supported by substantial evidence." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).

The ALJ has a duty base his decisions on an adequately developed record.  "This duty includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue." Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004); cf. Jones, 619 F.3d at 969 ("The ALJ is required to order medical examinations and tests only if the medial records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."). Accordingly, "[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001); accord Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992); Dozier v. Hackler, 754 F.2d 274, 276 (8th Cir. 1985).  Thus, while the ALJ is entitled to make credibility determinations concerning the testimony and medical opinions presented, he must still ensure that there is sufficient medical evidence remaining in the record to determine whether the claimant is disabled.

Here, the ALJ stated that "[t]here is little by way of medical evidence contained in the record and no evidence of significant medical worsening." (Tr. 14.) The ALJ ordered a psychological consultative examination, conducted by Dr. Marty, so that he could evaluate

plaintiff's depression. He did not, however, order any additional evaluation for plaintiff's narcolepsy. After assigning "little weight" to Dr. Hegde's opinion, the ALJ had no other medical opinion to rely on regarding plaintiff's narcolepsy, and scarce medical evidence in the record as a whole. This is an insufficient basis on which to reach a determination of no disability. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Gahan v. Astrue, No. 4:09 CV 1982, 2010 WL 5553972, at *8 (E.D. Mo. Nov. 24, 2010). Additionally, the ALJ expressed some confusion during the hearing regarding plaintiff's testimony that her narcolepsy causes her to fall asleep uncontrollably during the day yet not be able to sleep at night. (Tr. 32.) Ultimately, the RFC limitations appear inconsistent with the record.

The ALJ's findings about plaintiff's severe impairments appear inconsistent and need to be clarified with specific fact finding that is supported by substantial evidence. The ALJ found that plaintiff had the severe impairments of narcolepsy and cataplexy (Tr. 11), and that, overall, her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" (Tr. 14), but not to the full extent and severity alleged. He found that these impairments were sufficiently serious that plaintiff was unable to perform any past relevant work (Tr. 14), and that they limited plaintiff's ability, among other things, to interact with the general public and coworkers. (Tr. 12.) Yet, the ALJ implied that plaintiff had no need for unscheduled breaks, perhaps a logical consequence of narcolepsy. (Tr. 14)("It would seem logical that an individual with severe narcolepsy and the fear of not being able to control her episodes of sleep would not drive an automobile under any circumstances").

The lack of specific medical evidence and the ALJ's failure to cite to any such evidence in explaining his decision make it impossible to determine on review what led to the ALJ's decision and its apparent inconsistencies. See Allen v. Astrue, No. 4:10-cv-00001-NKL, 2010 WL 4643128, at *5 (W.D. MO) ("As the ALJ's decision to disregard Allen's allegations of daytime hypersomnolence was not based on substantial evidence, the Court finds that Allen's RFC was improperly determined.").

Therefore, the action must be remanded so that the ALJ can obtain and identify substantial medical evidence that would allow him to reach

a reasonable determination of plaintiff's impairments and their limitations, and what if any work she could perform with such limitations.

**D. Medical Worsening**

Plaintiff argues that the ALJ's finding that there was "no evidence of significant medical worsening" (Tr. 13, 14) of her impairments cannot withstand minimal scrutiny. Plaintiff points to treatment records indicating that her dosage of Provigil had been increased from a once-daily dosage of 200 mg in March 2007 (Tr. 258), to a twice-daily dosage in April 2007 (Tr. 259), to a thrice-daily dosage, constituting a total of 600 mg per day, by July 2008 (Tr. 261). The ALJ acknowledged this increase in dosage during the hearing. (Tr. 29.) Even with this continuous increase in dosage, plaintiff continued to suffer from uncontrollable daytime somnolence. (Tr. 262.)

The question of worsening or deterioration of a claimant's condition becomes a particularly important factor in a disability determination when the claimant had previously worked with a medical condition that she now claims is disabling and which apparently ground a finding that plaintiff cannot perform her past relevant work. See Schultz v. Astrue, 479 F.3d 979, 982-83 (8th Cir. 2007) ("Absent a showing of deterioration, working after the onset of an impairment is some evidence of ability to work."). Dosage of medication is one of several factors that an ALJ must consider in assessing a claimant's allegations of subjective symptoms. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

The Eighth Circuit has found remand appropriate when the ALJ fails to acknowledge a claimant's deteriorating condition. See Bowman v. Barnhart, 310 F.3d 1080, 1084 (8th Cir. 2002) (reversing and remanding the ALJ's decision because, *inter alia*, "the medical evidence does not show, as the ALJ found, that [plaintiff]'s condition had not significantly deteriorated since she was laid off from work"); Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995) (reversing and remanding ALJ's determination of no disability because "[w]hen viewed as a whole . . . the medical evidence demonstrates that [the claimant's] condition deteriorated," and considering older medical records was therefore inappropriate).

Here, the ALJ acknowledged plaintiff's increased dosages at the hearing. (Tr. 29.) But, in his written opinion, the ALJ stated that the record contained "no evidence of medical worsening." (Tr. 13-14.) The ALJ provided no explanation or discussion regarding plaintiff's increased dosages. Therefore, on remand, the ALJ must discuss plaintiff's increased medication dosages and determine whether they indicate any worsening in plaintiff's impairments. Such an explanation is further called for because in this case, plaintiff had recently performed some of her relevant work. Thus, a specific finding from the ALJ is necessary as to why plaintiff is incapable of performing her past work without any worsening in her impairments.

**E. Hypothetical Questions Posed to the VE**

Plaintiff further contends that the hypothetical questions to the VE did not capture the concrete consequences of her impairments and therefore do not constitute substantial evidence upon which the decision may rest.

"[A] VE's opinion is relevant only if the ALJ accurately characterizes a claimant's medical conditions in the hypothetical questions posed to the VE." Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005). However, the hypothetical questions "need only include impairments that are supported by the record and that the ALJ accepts as valid." Howe v. Astrue, 499 F.3d 835, 842 (8th Cir. 2007). Conversely, hypothetical questions based on false assumptions not supported by the record do not constitute substantial evidence. Hogg v. Shalala, 45 F.3d 276, 279 (8th Cir. 1995).

Here, the ALJ posed three distinct hypotheticals to the VE, each assuming a slightly different RFC. (Tr. 40-43.) Plaintiff's attorney also had the opportunity to pose hypothetical questions to the VE. (Tr. 43.) The ALJ subsequently found plaintiff's RFC and actual impairments to be consistent with the second hypothetical posed to the VE. Because the ALJ was entitled to base his vocational findings on only those impairments that he had deemed to be credible, the questions posed to the VE were, at the time, proper. However, to the extent that the ALJ's RFC finding may be modified upon remand consistent with this opinion, the testimony of the VE should be reconsidered in kind.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed under Sentence Four of 42 U.S.C. § 405(g) and remanded for reconsideration and further proceedings consistent with this opinion. An appropriate Judgement Order is issued herewith.

                            /S/   David D. Noce
                      **UNITED STATES MAGISTRATE JUDGE**

Signed on July 5, 2011.